[Crim. No. 6720. In Bank. May 1, 1961.]

THE PEOPLE, Respondent, v. BOBBIE BLANCHE
PRIVETT et al., Appellants.

Minsky, Garber & Rudof, Albert C. Garber and Robert P. Dockeray for Appellants.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

DOOLING, J.—Defendant Privett and defendant Walker, mother and daughter, were convicted by a jury respectively of burglary and receiving stolen property. They argue on appeal that the trial court erred in admitting over their objection evidence obtained as a result of an unlawful search of their home. The officers entered the home and made the search without a warrant, thus putting the burden on the prosecution to produce evidence sufficient to justify the entry and search. (*Badillo* v. *Superior Court*, 46 Cal.2d 269. 272 [294 P.2d 23].)

In the evening of September 13, 1958, an apartment occupied by Mrs. King was burglarized in her absence. Various articles identified as having been taken in this burglary were found in the home of appellants as a result of the search complained of. In addition one witness identified appellant Privett as the woman whom he had seen leaving the entrance of the building in which Mrs. King's apartment was situated on the night of September 13, 1958, in the company of a man whom this witness was unable to identify. The man was carrying two suitcases and the woman had some clothing thrown over her arm. Another witness testified that she saw the two appellants standing together near the apartment house entrance on the same night, but the effect of her identification was weakened by the fact that she described both women as slender while Mrs. Walker testified to being eight and one-half months' pregnant at that time. Both appellants testified that they had not been in the neighborhood of Mrs. King's apartment on the day or night in question and stated that Edwards had brought the stolen articles to their home, and that they had assumed that they belonged to his wife from whom he was separated.

The only possible justification for the search of appellants' home is to be found in the testimony of Deputy Sheriff Sulli-

van. Sullivan testified that four or five days before September 18, 1958, he observed one Clair Edwards step out of an automobile containing two women and some small children and hold a conversation in the street with one Gould, whom Sullivan knew to be a burglar. He afterwards examined police records and ascertained that Edwards also had a burglary record. By tracing the license number of the car Sullivan obtained the address of appellants' home. On September 18 the officers commenced a surveillance of appellants' home and saw appellants, Edwards and some small children entering and leaving the house at various times over a period of three days. On September 21 at about 9 p. m. Sullivan with six or seven other officers gathered in the street opposite appellants' home. None of the officers was in uniform and they were all dressed in "rough clothing." They saw Edwards and appellant Privett at the window of a front bedroom looking in their direction. The officers proceeded across the lawn, knocked on the front door, and "almost instantly . . . the lights went out." They called out that they were police officers and receiving no response, they kicked in the front door. Sullivan immediately arrested Edwards and the questioned search by the officers followed. Two days later a second search, also without a warrant, was made. There was no testimony as to the charge upon which Edwards was arrested nor any testimony that at the time of Edwards' arrest and the ensuing search Sullivan or any of the officers with him knew of the King burglary or had reason to believe that Edwards had committed that burglary or any other felony.

An arrest without a warrant can only be legally made if the person arrested has committed a public offense in the presence of the arresting officer or if the arresting officer has reasonable cause to believe that the person arrested has committed a felony. (Pen. Code, § 836; *People* v. *Boyles,* 45 Cal.2d 652, 655 [290 P.2d 535]; *People* v. *Simon,* 45 Cal.2d 645, 648 [290 P.2d 531].)

The question of probable cause to justify the arrest of Edwards and the search of the premises incident thereto must be tested upon the facts which the record shows were known to the officers at the time the arrest was made. (*People* v. *Paul,* 147 Cal.App.2d 609, 618 [305 P.2d 996].) Baldly stated, those facts were: 1. Some days before September 18, 1958, Edwards was seen talking to a known burglar; 2. police records showed that Edwards had a previous record for burglary; 3. Edwards, the appellants and their children over

a period of three days were seen in and about appellants' home; 4. when seven or eight men wearing rough clothing walked across the lawn, after seeing Edwards and appellant Privett looking out of a bedroom window, and knocked at the door the lights went out, and when they identified themselves as police officers there was no immediate response. Taken separately or all together, these facts could not constitute reasonable cause to believe that Edwards had committed a felony so as to justify his arrest without a warrant. The facts that Edwards had a burglary record and was seen talking to a known burglar, while relevant, are not sufficient to constitute reasonable cause to believe that Edwards had committed a burglary or any other felony. (*People* v. *Sanders,* 46 Cal.2d 247, 251 [294 P.2d 10].) The conduct of Edwards in entering and leaving the appellants' home is not shown to have been accompanied by any suspicious conduct of any sort. There is nothing to support a reasonable belief that any man, no matter how bad his past record, has committed a felony simply because he is seen going in and out of a private home in a normal manner. This leaves only the turning out of the lights and the failure briefly to respond to the call of ''police officers'' after seven or eight roughly dressed men crossed the lawn in a body and knocked at the door in the darkness of night. While evasive conduct upon the approach of police officers may under proper circumstances justify an arrest and search (*cf. People* v. *Gardner,* 177 Cal.App.2d 43 [1 Cal.Rptr. 830] ; *People* v. *Williams,* 175 Cal.App.2d 774 [1 Cal.Rptr. 44] ; *People* v. *Amado,* 167 Cal.App.2d 345 [344 P.2d 254]), the observed approach to a private home in the nighttime of a party of seven or eight roughly dressed men and their knocking on the door might reasonably lead the most innocent of persons to extinguish the lights hoping that they would depart, and their subsequent announcement that they were police officers might reasonably arouse a degree of scepticism that would lead the occupants to make no immediate response or indeed any response at all, except possibly to telephone for the aid of those whom they knew with certainty to be police.

This court has held that an arrest without a warrant can only be made if the facts known to the officer *before* making the arrest would justify the officer in making the arrest, and that such an arrest cannot be justified by what a search following the arrest turns up. (*People* v. *Brown,* 45 Cal.2d 640, 643 [290 P.2d 528].)

█ The sanctity of a private home is not only guaranteed by the Constitutions of the United States and of our own state, but it is traditional in our Anglo-Saxon heritage. "A man's home is his castle" is, and should be, more than an empty phrase. The Constitutions themselves point to the proper procedure to be followed in invading this precious sanctity. "[N]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U. S. Const., amend. IV; Cal. Const., art. I, § 19.) █ There was no emergency in this case which would have prevented the officers from seeking a warrant from a magistrate to enter this home. They had it under surveillance for three days and if they had sufficient evidence to satisfy a magistrate that a warrant should issue, they had ample opportunity to secure one. █ Although a private home may be broken into without a warrant, even in the nighttime, if probable cause exists, in doubtful cases the householder should be entitled to have the protection of the independent judgment of a magistrate before the constitutionally guaranteed sanctity of his home is invaded.

█ Whether or not we characterize Edwards and Gould as "professional burglars" because they both had a past burglary record, whether or not we characterize their street conversation as "making a meet" (thus by a semantic slant putting an aura of criminality about what so far as the police officers knew was an entirely innocent conversation), and whether or not we add the additional fact that a large number of burglaries were committed in Los Angeles County in 1958, we would still have no more than a reason for further police investigation of Gould and Edwards to determine whether any substantial evidence could be discovered which would connect either of them with the commission of any one or more burglaries. It would be destructive of the constitutional safeguards to permit police officers to break into any private home where the officers had no information tending to connect any occupant thereof with any reported or known felony.

It is impossible to distinguish this case in principle from *People* v. *Sanders, supra,* 46 Cal.2d 247. There the defendant was known to the arresting officers as a bookmaker who had been convicted in the past of bookmaking. The defendant was operating a phonograph record shop. Another bookmaker had been arrested in the shop on the day before. The officers,

after entering the shop, looked through a hole in the door to a private room and saw defendant with a pencil in his hand and on a table in front of him ''some pads of paper that appeared to be 'the kind and character of pads of paper used . . . by bookmakers . . . ,' and they saw writing on the pads.'' (46 Cal.2d at p. 249.) The officers entered and arrested the defendant for bookmaking. We said in that case, in holding the arrest to have been made without probable cause: ''When the officers looked through the door they saw nothing that was incriminating. They merely saw defendant standing behind a desk with a pencil in his hand and two pads of paper in front of him. There was writing on the pads. Defendant was operating a record store open to the public, and just as in the case of any shopkeeper, businessman, or professional man, he might reasonably be expected to have pencils and pads of paper available for making notes and memoranda for use in the legitimate conduct of his business. . . . Similar pads may be found in almost every office, and certainly, the fact that bookmakers also use them cannot constitute reasonable cause to believe that everyone using them is engaged in bookmaking. . . . [*T*]*he fact that defendant had been a bookmaker in the past or bore that reputation and the fact that another bookmaker had been on the premises the day before,* would not of themselves constitute reasonable cause to believe that defendant's conduct, which was perfectly consistent with the lawful conduct of his business, in fact constituted occupancy of the premises for the purpose of bookmaking.'' (Emphasis added; 46 Cal.2d at pp. 249-251.)

Substitute record of burglary for record of bookmaking, substitute conversation on the street with another man who also had a burglary record for ''the fact that another bookmaker had been on the premises the day before,'' and the parallel could hardly be closer. It would seem that in Sanders the police expertise with regard to bookmaking would be equal to the police expertise with regard to burglary in the present case; and, while we have every sympathy for the problems of the police, we cannot permit such sympathy to weigh against the unjustified invasion of the constitutionally protected security of the home and person; nor on any theory of police expertise, or otherwise, hold that a private home may be violently entered on the meager showing made in this case.

We are satisfied that without this evidence there is a reasonable probability that the result would not have been the same,

and that the error in its admission was prejudicial to the appellants.

Judgments reversed.

Gibson, C. J., Traynor, J., Peters, J., and White, J., concurred.

SCHAUER, J.—After studying the record in this case I am satisfied that the opinion prepared for the District Court of Appeal by Presiding Justice Wood, and concurred in by Justices Fourt and Lillie (Cal.App., 1960), 5 Cal.Rptr. 748, adequately discusses all material issues and correctly affirms the judgments as to both appealing defendants. I adopt that opinion by reference but because a majority of this court disagree with both the trial judge and the three justices of the District Court of Appeal, it appears to be in the interest of justice to state more fully why I find the conclusions of the four judges above mentioned more persuasive than those of my associates.

I can find in the record no substantial basis for concluding (the basis for reversal required by Cal. Const., art. VI, § 4½) that the judgments of conviction worked a miscarriage of justice. The defendants assert that ''This is another case in which a trial court and an appellate court have joined together in an attempt to further emasculate the salutary rule laid down by this Court in *People* v. *Cahan* (1955), 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].

''The sole question to be determined by this Court is whether the trial court and District Court of Appeal were correct in holding that the arrest of these appellants and the search of their private premises was [*sic*] based upon reasonable and probable cause, as defined in *Cahan, supra,* and the multitude of decisions thereafter.

''This question, in turn, depends largely upon whether or not the arrest of a co-defendant, Edwards, on the premises of these appellants, was based upon reasonable or probable cause.''

I have no quarrel with the Cahan decision but I must part company with my associates when (as it seems to me that they do in this case) they fail to accord appropriate respect to the most fundamental rule of appellate review; i.e., that every legally permissible inference shall be drawn in favor of upholding the factual determinations and judgment of the trial court. The proper test on appeal is never to reweigh evidence

or conflicting inferences but only to ascertain whether there is any substantial evidence to support the conclusion of the trier of fact. (*People* v. *Newland* (1940), 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Daugherty* (1953), 40 Cal.2d 876, 885 [4, 5] [256 P.2d 911].) And I believe this court should impose at least equal restraint upon itself when reviewing the reasonableness of police action as when testing the finding of a jury or trial judge. The implied finding of the officers that they had reasonable cause to enter the premises and arrest Edwards is entitled to a prima facie presumption of validity.

Inasmuch as we are gauging the reasonableness of action by the police our duty, I think, requires that we determine not the weight but the bare existence of substantial evidence from the viewpoint of the police. In that statement, by the words "viewpoint of the police," I mean the reasonable viewpoint of a skilled and experienced officer acting honestly in obedience to law and in the regular discharge of his official duty. On this appeal by defendants we are bound to presume in favor of sustaining the judgments against them that not they, but the officers are "innocent of crime or wrong," that "official duty has been regularly performed"; and that "the law has been obeyed." (Code Civ. Proc., § 1963, subds. 1, 15, 33.) Certainly police officers are, and should be, subject to our constitutional standards. It is of course for this court, not the officer, to make the ultimate determination whether there was reasonable cause for arrest and search (*People* v. *Boyles* (1955), 45 Cal.2d 652, 656 [7] [290 P.2d 535]). But it seems equally certain to me that in making such determination this court should, as the trial court here did, regard the whole body of facts and expertise upon which the officer acted and respect the circumstance that the officer, trained and experienced in police work and in the ways of criminals, was entitled to call upon his store of knowledge and his own professional skills in the drawing of inferences from facts before him. To hold otherwise is to deprive the public of the benefits of a goodly portion of the special qualifications of those highly informed and understanding men who have earned burglary detail assignments.

The direct effect of the majority's holding in this case is to reverse two judgments of conviction. These convictions are reversed not because there is any substantial doubt as to the guilt of either defendant, and not because either defendant has been denied due process, but only because the majority justices, working from their own knowledge and experience,

comprehensive and varied as they may be, do not draw from the facts shown in the record the same inferences which the trial court drew (and determined that the burglary detail officers properly drew) from those facts as observed by the officers and interpreted in the light of the officers' training and expert knowledge. The officers thought they had good cause to act; the trial court agreed; the majority of this court say that the officers acted without reasonable cause (even though the result of the police action seems to demonstrate that the officers' deductions were correct). This, I think, constitutes improper application of the Cahan rule; i.e., it is applied to exclude evidence on a theory that the police did not have reasonable cause to act when in fact by proper police standards of knowledge and expertise they did have good cause. Such improper application is not the fault of the rule but it tends to defeat justice and may well encourage legislative action to curtail, if not abolish, such rule as being the only practicable method of preventing abuses of it.

A police officer (and a judge engaged in the trial of criminal cases) soon learns that not all skilled professional men devote their talents to the *honorable* professions. There are, of course, amateur burglars (whose work can often be recognized as such by experienced police), and there are professional burglars of varying degrees of skill and of differing schools of thought as to the more desirable areas of operation and techniques of execution. The number of men and women who practice burglary is large. In Los Angeles County alone, in the year 1958 (the year of the subject crimes) 62,082 burglaries were reported. That is at a rate of more than 170 each day of the year. In the state at large, burglary, in 1958, constituted 53 per cent of all the crimes reported in the seven major offense group.[1] Surely the sheriff's deputies and the policemen had a right to take into consideration such high incidence of burglaries. The District Court of Appeal (in *People* v. *Stewart* (1961), 189 Cal.App.2d —— [10 Cal.Rptr. 879]) in sustaining questioning (of an initially unknown suspect) which led to arrest and search and the finding of a narcotic, declared (p. —— [1]) ''In the instant case the fact of recent armed robberies certainly justified the officers in

---

[1]The numbers of the seven major reported offenses in California for 1958 are respectively as follows:

Burglary: 114,371; auto theft: 50,392; grand theft (except autos): 19,258; aggravated assault: 16,720; robbery: 13,224; forcible rape: 3,216; wilful homicide: 595. (Crime in California (1958), Department of Justice, Bureau of Criminal Statistics.)

talking to appellant." It is of course to be presumed that members of the sheriff's and police department's burglary details were kept informed of reported burglaries (including the one in the subject case) occurring in their respective jurisdictions. Whether they knew of this particular burglary, or had it in mind, is, however, unimportant.

In my view it is entirely proper for officers engaged in police work to regard, at least tentatively, men who have suffered prior convictions of burglary as being professional burglars. If they are professional burglars it is to be assumed that they are actively practicing their profession. This would seem to be particularly true when, as here, two of such "professionals" are observed to be in "conference."[2] Recent examples of cases in which the appellate courts of this state, in determining whether there was probable cause for an arrest and incident search, have recognized that police officers are entitled to take into consideration the probable propensities of those known to have committed prior offenses and those who associate with known criminals are *People* v. *Ingle* (1960), 53 Cal.2d 407, 413-414 [5, 6, 7, 8] [348 P.2d 577] ; *People* v. *Sanchez* (1961), 189 Cal.App.2d ——, ——, —— [3a, 3b] [11 Cal.Rptr. 407] ; see also *People* v. *Strelich* (1961), 189 C.A.2d ——, —— - —— [1, 2] [11 Cal.Rptr. 807].

The convict Edwards and one James Gould were known burglars; i.e., the police were entitled to suspect them as professional burglars, actively engaging in their chosen business. The appellants Privett and Walker, and Edwards (who was arrested at the same time and on the same charge as defendant Privett and who, apparently at the preliminary hearing, pleaded guilty to receiving stolen property), were observed together in an automobile, on or a few days prior to September 18, 1958. Edwards was seen to leave the car and converse with Gould; the automobile, by its license number, was found to be registered as belonging at the house which Deputy Sheriff Sullivan testified was placed under constant surveillance "for a period of four or five days commencing on [or a few days prior to] September 18." Defendants Walker and Privett, and Edwards, were observed "coming and going from this location." In reply to the question, "[D]id you have any particular reason for keeping the premises under surveillance?" the deputy responded, "Yes, we did. We started keeping them under surveillance as a result of obtaining a license number on a vehicle in which Mrs. Walker and Mrs. Privett and Mr.

---

[2] In the vernacular of the professional burglar, "making a meet."

Edwards were riding at the time that they had made a meet with a known burglar [the above mentioned James Gould]."

As to the entry of the house, the arrest of Edwards, and the first discovery of stolen property, Deputy Sheriff Sullivan testified: "[M]y partner, Sergeant Cataldi, Deputy Krueger and myself approached the house in the front, across the lawn, and as we were going across the lawn the lights were on in this house.

"Q. About what time of the day or night was that? A. It was approximately 9:00 p.m.

"Q. And as you looked at the house you saw that the lights were on inside of the house? A. Yes, they were.

"Q. Did you see anyone in the house at the time you were approaching it? A. Yes, sir, I did. I observed Mrs. Privett and Mr. Edwards.

"Q. And what part of the house were they in when you observed them? A. They were in the west front bedroom.

"Q. What did they appear to be doing when you looked at them? A. They appeared to be looking out the window.

"Q. Were they looking in your direction or opposite direction? A. They were looking in our direction. We were walking across the lawn.

"Q. And the house after that incident, did the lights go out? A. Just a matter of seconds. We were walking to the front door and knocked on the front door and almost instantly with the knock on the door the lights went out.

"Q. And what did you do after you knocked on the door? A. When the lights went out, we identified ourselves as officers and asked admission.

"Q. How did you identify yourselves? A. Sheriff's Office, police officers.

"Q. And what did you do after you did that? A. When there was no response we kicked the door open and made entry."

As to his knowledge of defendant Edwards' "professional" attainments Deputy Sullivan testified that he knew Edwards "Not personally, only by reputation . . . By search of the records[3] and going back and studying his modus operandi or method of operating burglaries and so on and so forth."

---

[3]In the circumstances the police officers are, of course, presumed to have known what was in the police records. According to a statement by counsel for the defendants, Edwards had a "two-page police record."

Called as a witness for defendants, Edwards answered three questions (his answers were: "Granada Hills"; "I did"; "Yes, I did") and to the next twelve questions replied (specifically or in substance): "I decline to answer on the ground that it may tend to incriminate me."

In reference to the other "known burglar," Gould, the trial court in ruling against the defendants' contention that the entry and search were illegal stated: "You have a case where there is a known burglar, the case of Edwards who has suffered a previous conviction, that he is aware of the burglary and receiving stolen property, his consorting and meeting with another known burglar who had three prior convictions, you see. Now this officer and I happen to know Gould's record because I just got through trying him and finding him guilty. He now has four, and at that time he had three, now four instead of three. This officer testified he was a known burglar, that he and Mr. Edwards were known burglars and he sees him consorting and talking so he puts the place under surveillance. He sees him going in and out freely, not Gould, Edwards, but these people going in and out frequently, and certainly there is reasonable and probable cause to make that search." I agree with the trial court.

The majority state that "The conduct of Edwards in entering and leaving the appellants' home is not shown to have been accompanied by any suspicious conduct of any sort." In my view the majority's statement appears to be inconsistent with the evidence hereinabove related. From what the *officers* observed and what *they* knew, I think *they* had reasonable cause to believe that burglaries had been committed, that one or more of the persons in the appellants' home had participated in a burglary and that stolen property might well be found in the premises if entry was promptly made. Delay might permit its being hidden, or the escape of a guilty person.

The majority further suggest that "the observed approach to a private home in the nighttime [about 9 p.m.] of a party of seven or eight roughly dressed men and their knocking on the door might reasonably lead the most innocent of persons to extinguish the lights hoping that they would depart, and their subsequent announcement that they were police officers might reasonably arouse a degree of scepticism that would lead the occupants to make no immediate response or indeed any response at all, except possibly to telephone for the aid of those whom they knew with certainty to be police." Perhaps, as the majority suggest, "the most innocent of persons" might be frightened and might turn out the lights and telephone the police. But I think that three persons together in a single residence, one of them guilty of burglary, another guilty of receiving stolen property (with stolen property in the house), and the third being a professional burglar, might be even

more frightened and turn out the lights and hope that the police would not dare *break* in — or that they could "get sprung" by justices more gullible than the police. The very advancement of this argument by the majority seems to me to suggest that they are viewing the evidence in a light favorable to reversal rather than affirmance.

As authority for holding that in the circumstances of this case the police acted unlawfully when they forced entry as above related, the majority rely principally upon the majority decision in *People* v. *Sanders* (1956), 46 Cal.2d 247 [294 P.2d 10]. There are, however, substantial differences between the facts of that case and those in the case at bench. First of all it is to be noted that in Sanders we affirmed the order of the trial court granting defendant's motion to set aside the information; here, the judgments are being reversed.

Secondly, in Sanders the police simply walked into a store which was open for business and, looking through an open door panel, observed the proprietor doing nothing suspicious. As described in the Sanders opinion (p. 250 [1b] of 46 Cal.2d), "[B]efore the arrest and search defendant's activities appeared to be perfectly consistent with the lawful conduct of his [phonograph] record business. Defendant was merely present in his office with a pencil in his hand and pads of paper on the table in front of him, and there was no basis for concluding that he was using these items for bookmaking rather than for his business that was then open to the public. Moreover, since there was no telephone in the room where defendant was, or any indication that he had just completed a telephone call, or that any other person was present, there was absolutely no basis from appearances for concluding that the writing on the pads was in response to a call or calls that might have been made to place bets or to record bets placed by persons visiting the shop."

It is apparent that, among the obvious differences between the Sanders case and the present case, in Sanders the place had not been under surveillance for three or four days with frequent comings and goings of persons under suspicion. It is true that Sanders had been known as a bookmaker and, hence, had a background of criminal activity but at that point the similarities of the Sanders case and this case cease. The proclivities of that bookmaker (or others of his class) and those of the subject professional burglar (or others of his type) may be considerably different and, when viewed by an officer who is qualified as an expert and who had knowledge

of both the suspect and the circumstances shown here, might well support differing inferences. In the Sanders case, also, there was no knocking on the door by persons who identified themselves as police officers, who requested admission, and who received as a response only the turning out of the lights.

In *People* v. *Simon* (1955), 45 Cal.2d 645, 650 [7] [290 P.2d 531], this court said, ''There is, of course, nothing unreasonable in an officer's questioning persons outdoors at night [citations], and it is possible that in some circumstances even a refusal to answer would, in the light of other evidence, justify an arrest.'' (See also *People* v. *Michael* (1955), 45 Cal.2d 751, 754 [4, 3b] [290 P.2d 852].) If there is nothing unreasonable in officers' questioning persons outdoors at night it appears to me that, when officers have had a known burglar and his associates under surveillance while they came and went from the same house for several days and nights and have seen them travel together in an automobile to a spot where the known burglar ''made a meet'' with another professional burglar, there is nothing unreasonable in the officers' seeking to question such persons inside their house at about 9 o'clock in the evening. When those persons, instead of answering the officers' knock, turned out the lights and refused for even a brief period to open the door or make other response when the officers identified themselves, then as good police officers knowing what they knew, it seems to me that they did not act irrationally in concluding that they had no proper alternative but to break into the house. (See *People* v. *Martin* (1955), 45 Cal.2d 755, 762-763 [12, 14, 16] [290 P.2d 855].)

It has been argued that the officers should have surrounded the house to prevent anyone from leaving it and sent one of their number to seek out a judge and request the issuance of a search warrant, but it does not seem to me that the course which the officers here did pursue can be branded as unreasonable and unjustified as a matter of law. If the Sanders case, *supra,* 46 Cal.2d 247, is, as the majority assert, irreconcilably inconsistent with upholding the conduct of the officers in the case now before us, then I would say that rather than following Sanders we should unhesitatingly overrule it. However, it does not appear to me that Sanders is in principle indistinguishable. As above indicated, in that case officers, without permission or warrant, entered a room in which Sanders, although a known bookmaker, was pursuing an apparently innocent business so far as the officers, prior to arresting him and searching his premises, were able to observe. Here, on the other hand,

defendants' behavior when the officers knocked and identified themselves was itself suspicious. If the Sanders case is susceptible of the interpretation that law enforcement officers cannot rely on their knowledge of the criminal profession of one whom they arrest as being one circumstance which, taken with others, can show reasonable cause for belief that the defendant is engaged in his criminal trade at the time of arrest, I would disapprove such implication.

In studying this case it has seemed to me—although I cannot know under what difficulties the prosecutor may have worked—that more details as to the actual knowledge of the officers leading up to their surveillance of the defendants and entry of the premises might well have been spelled out in the evidence. Such details could easily have included those which I have supplied simply from reference to published official reports, with which we can infer or presume the officers were familiar but as to which not all of us might be informed. Nevertheless, it remains the duty of an appellate court in reviewing a record to be ever mindful of the rule that every permissible inference is to be drawn in favor of affirming the trial court's judgment. It is also to be presumed that the officers acted regularly in the performance of official duty. As I view this record and apply that rule I am impressed with the conclusion that the deputy sheriffs and police officers drew proper inferences and that the trial judge and the three justices of the District Court of Appeal reached rational conclusions. I think the efficient and intelligent men of the sheriff's and police department's burglary details should be commended for their alert and expeditious action rather than condemned for making illegal entry, and frustrated in what must have seemed to them a job well done.

I would affirm the judgments.

McComb, J., concurred.