[Crim. No. 6121. Third Dist. Nov. 15, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES SCHAD, Defendant and Appellant.

**COUNSEL**

Bradford & Stanley and Jerome S. Stanley for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, Nelson P. Kempsky and Willard F. Jones, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JANES, J.**—Defendant appeals from the judgment (order granting probation)[1] following pleas of guilty to one count of possession of seconal in violation of Health and Safety Code section 11910 and a count of possession of cocaine for sale in violation of Health and Safety Code section 11500.5,[2] contending that evidence against him was obtained by (a) an illegal entry and consequently illegal search and seizure of narcotics in his home and (b) an illegal entry, search and seizure of narcotics in a hospital emergency treatment room.

We summarize the evidence from the transcript of the preliminary examination, upon the basis of which the trial court denied defendant's motions to set aside the information and to suppress evidence.[3]

---

[1]Although, as the Attorney General points out, both the notice of appeal and certificate of probable cause were untimely, we deem it appropriate to entertain the appeal on its merits. (*People* v. *Herrera* (1967) 66 Cal.2d 664 [58 Cal.Rptr. 319, 426 P.2d 887].)

[2]Initially, an information was filed in number 37312 charging both defendant and his wife, Delores Schad, with possession of heroin for sale (Health & Saf. Code, § 11500.5) possession of marijuana (Health & Saf. Code, § 11530) and the instant count of possession of seconal. By separate information (number 37316) defendant alone was charged with possession of cocaine for sale (Health & Saf. Code, § 11500.5). In a plea bargain, defendant pled guilty to the charge of possession of cocaine for sale (number 37316) and to the third count in number 37312, possession of seconal. Thereupon the heroin and marijuana counts were dismissed, in the interests of justice, as to both defendant and his wife.

[3]Following denial of his motion to set aside the information, defendant's petitions for writs of prohibition were denied by both this court and the Supreme Court. We deem it unnecessary to pass upon the Attorney General's contention that defendant is thereby precluded by the law of the case from now attacking the two searches and seizures. The question of application of that doctrine, in such proceedings, awaits decision by our Supreme Court. (See *Funeral Dir. Assn.* v. *Bd. of Funeral Dirs.* (1943) 22 Cal.2d 104 [136 P.2d 785] and *People* v. *Medina*█ (Cal.App.) 97 Cal.Rptr. 25 (hearing granted by the Supreme Court, October 21, 1971).)

## *The Seconal Offense*

Investigating officers were reliably informed that defendant was engaged in the sale and possession of narcotics. On June 16, 1970, a warrant was issued authorizing the search of his home at 4305 23d Avenue, Sacramento, California. Officers went to the premises at approximately 6:30 p.m. that date, but did not serve the warrant because it appeared no one was home. The following day, at about 10 a.m., approximately eight officers, including Agents Lindsay, Leonard and Cozzalio of the State Bureau of Narcotic Enforcement and Detective Tobler of the Sacramento sheriff's office, returned to the neighborhood of defendant's house.

Agents Lindsay and Leonard went to the front door. Both were garbed in sport clothes, Lindsay in green sta-press Levi's and a short sport shirt and Leonard in a brown shirt and a pair of checkered pants. Lindsay wore a goatee-type beard with a mustache, but the rest of his face was clean-shaven. His hair was not long, but he was in need of a haircut. Leonard's hair was 4″ to 5″ long and he wore a mustache. The rest of his face was clean-shaven. Agent Lindsay testified that he was deliberately dressed and bearded to look like a "hippie" or somebody in the narcotic trade or business, in order to assist him in his work as a narcotic agent.

In their position at the front door, the two officers could hear adult voices inside the house but no one answered their knocks on the door. They knocked 4 or 5 times, 3 or 4 times apiece, at approximately 15 second intervals for about 2 minutes. They also announced very loudly several times, "Police officers. Open the door. We have a search warrant." Agent Lindsay then observed a small child look out a bedroom window adjacent to the front door.

Detective Tobler and Agent Cozzalio, cruising in the latter's patrol car, observed the two officers at the front door for approximately two minutes. They then drove toward the residence and Tobler saw a woman looking out a side window in the direction of the front porch. He directed Cozzalio's attention to this fact and as Cozzalio drove by the front of the house he shouted that someone was at the side window, and ordered the two agents to kick in the door.

Agents Lindsay and Leonard kicked the area of the door around the door knob, forcing the door open. The agents observed Delores Schad, defendant's wife and two small children, in the dining room. Lindsay had his badge out and again announced, "Police officers." Mrs. Schad ran out a back door screaming, with the officers in pursuit. She was apprehended in the back yard and escorted back inside the house where the warrant was served. A search of the house revealed 13.5 grams of heroin, 2.5 grams of

secobarbital, and 28.1 grams of marijuana. Defendant was arrested later in the day.

### The Cocaine Offense

On July 28, 1970, at approximately 7 p.m., Agents Peters and Schalansky of the State Narcotic Bureau went to the Sacramento Medical Center upon receiving word from the medical staff at the center that defendant was en route for treatment after telephoning that he had swallowed four prophylactics containing cocaine.

Upon arrival the agents obtained permission from the physician in charge to wait outside the emergency room; they were informed by the doctor that in treating defendant he would be induced to vomit. The doctor stated that if the prophylactics were recovered they would be turned over to the officers.

Shortly before 8 p.m., the officers saw defendant enter the emergency room, accompanied by a nurse. The agents remained in the hallway outside the room. A short time later, the officers heard the nurse scream, "he's trying to flush whatever he . . . vomited." The officers immediately entered the emergency room and the nurse handed them a prophylactic which contained a white powdery substance. The officers observed defendant vomit a second prophylactic which contained a substance similar to that contained in the first. They then placed him under arrest. The two prophylactics contained 4.3 grams of cocaine.

### The House Entry

The validity of the search warrant is not questioned. It is defendant's contention that there was an unlawful entry by the officers which rendered illegal the subsequent search and seizure of the contraband. The thrust of his argument is that the officers complied with the form but not the substance of Penal Code section 844; that adequate notice of their authority was not given because their appearance contradicted their words; and that there was no indication of suspicious activity inside the house which would justify the forcible entry.

Analysis of the requirements of section 844 and—more appropriately here—its companion statute, Penal Code section 1531,[4] and the interpre-

---

[4]Section 1531 reads as follows: "The officer [mentioned in its directions] may break open any outer or inner door or window of a house, or any part of a house or anything therein, to execute the [search] warrant, if, after notice of his authority and purpose, he is refused admittance."

tive cases, demonstrates that the officers here complied at least literally with the requirements enjoined upon them.

■ Section 1531 is concerned with forcible entry by an officer in possession of a search warrant, while section 844 relates to forcible entry to effect an arrest. Although the sections are worded somewhat differently, the courts have interpreted them to encompass the same basic rules with which an officer must comply before making a forcible entry; (1) the officer must knock or employ some other means reasonably calculated to notify the occupant of his presence; (2) he must make some statement of his authority—normally by identifying himself as a police officer; and (3) he must state or explain his purpose for demanding admittance. (*Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 319 [82 Cal.Rptr. 348, 461 P.2d 628]; *People* v. *Garnett* (1970) 6 Cal.App.3d 280, 290 [85 Cal.Rptr. 769].) In evaluating an officer's compliance with those principles the rule is, of course, that the courts look only to the facts and circumstances with which the officer is faced at the time he makes his decision and acts upon it. (See *People* v. *Ingle* (1960) 53 Cal.2d 407, 414 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Murphy* (1959) 173 Cal.App.2d 367, 377 [343 P. 2d 273].)

Although we are reluctant—because of the likelihood of violence and possible injury both to officers and suspects under circumstances such as those here present[5]—to approve the service of a search warrant by officers so attired and adorned, no reported case enlarges the requirements of sections 1531 or 844 by insistence that an officer serving a search warrant be in uniform or business suit, or that such officers wear their hair short or long or be with or without other hirsute adornment. ■ The courts are generally aware that narcotics agents and other officers engaged in narcotics work—particularly at the investigative phase—often assume an unkempt or "hippie-type" appearance to assist them in their duties, and we cannot say, on the record before us, that the investigative phase of the officers' duties ended with procurement of the search warrant. Since the officers had a search warrant, the burden is not upon the prosecution to show proper justification but upon the defendant to show an unlawful entry and search. (Cf. *Horack* v. *Superior Court* (1970) 3 Cal.3d 720, 725 [91 Cal.Rptr. 569, 478 P.2d 1].) That burden has not been met.[6]

---

[5]See Blakey, *The Rule of Announcement and Unlawful Entry: Miller* v. *United States and Ker* v. *California* (1964) 112 U.Pa. L.Rev. 499, 557-558, suggesting that questions of announcement and unlawful entry should be approached from the aspect of discouraging potentially violent situations.

[6]Defendant's reliance on *People* v. *Privett* (1961) 55 Cal.2d 698 [12 Cal.Rptr. 874, 361 P.2d 602] is misplaced. *Privett* involved a *warrantless* entry, arrest and search by seven or eight "roughly dressed" officers who, during the course of a bur-

Here an informant had purchased a quantity of marijuana at defendant's residence; on that occasion a woman answered at the front door. On the basis of that event, a warrant was issued for the search of defendant's home. Following one abortive attempt to serve the warrant, the two agents, with warrant in hand, appeared at defendant's house, knocked loudly and long on the front door, several times identified themselves orally as officers, explained that their purpose in seeking entrance was to serve a search warrant, and demanded that the door be opened. The agents heard adult voices inside, but the door was not opened to them. After breaking in the door, and before crossing its threshold, Agent Lindsay further identified himself by exhibiting his badge and announcing, "Police officers."

While we might question, by hindsight, whether the officers' costuming was proper police administration in the present case, we have concluded that the subterfuge—if that it was—did not invalidate the officers' entry. In so concluding, we are mindful, too, that the officers could reasonably have been guided in their own actions by their assessment of possible peril to themselves,[7] the possible destruction of evidence,[8] and frustration of the search and possible arrest of the suspects. (See *People* v. *Carrillo* (1966) 64 Cal.2d 387, 391 [50 Cal.Rptr. 185, 412 P.2d 377]; *People* v. *Peterson* (1970) 9 Cal.App.3d 627, 631 [88 Cal.Rptr. 597].)

### *The Hospital Room Entry*

We have summarized, under the heading, *"The Cocaine Offense"* (*supra*), the facts surrounding the officers' entry of the hospital room and seizure of the cocaine. We reject defendant's contention that entry of the hospital room in which he was being treated was unlawful and that the evidence seized as a result of the entry should have been excluded.

---

glary investigation, knocked on the front door of a residence at about 9 p.m., and "almost instantly . . . the lights went out." (*Id.*, p. 701.) The officers then called out that they were police officers and after receiving no response they kicked in the front door and the questioned arrest and search were made. The officers had no reasonable suspicion or probable cause to arrest or enter upon approaching the house. The pivotal part of the decision is the court's observation that the occupants of the house might reasonably be skeptical that the men at the door were officers, and that their lack of response and extinguishing of the lights were not, under the circumstances, the type of suspicious or furtive conduct supportive of probable cause to make either a search or an arrest without a warrant. The court expressly pointed out that the officers had ample opportunity and should have obtained a search warrant before seeking entry. (*Id.*, pp. 702-703.)

[7] Although there were "covering" officers, the agents who approached the front door were but two in number.

[8] A reasonable fear—in the light, at least, of hindsight—as appears from the incidents of the cocaine offense.

■ Many areas of a hospital are public places and as such are not areas subject to constitutional protection from entry without warrant for either arrest or search and seizure. (See, e.g., *People* v. *White* (1968) 259 Cal. App.2d Supp. 936, 939-942 [65 Cal.Rptr. 923].) The public hallway where the officers waited was clearly such an area. There can, of course, be private areas within public places, such as a toilet stall offered to the public for private, although transient, individual use (*Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817]), where general or routine clandestine observation to detect criminal acts is both an unlawful search and an invasion of the constitutional right of privacy. ■ However, assuming arguendo that the emergency room of a public hospital is a private place, observations of activties in such place are proper when there is cause for an investigation of activity therein, such as the receipt of particular information from someone having custody of the room or place that illegal acts or contraband may be observed or found therein. (See *People* v. *Clyne* (1968) 263 Cal.App.2d 331 [69 Cal.Rptr. 559], involving a restroom in a laundromat; *People* v. *Superior Court* (1968) 261 Cal.App.2d 687 [68 Cal.Rptr. 281]; cf. *People* v. *De Santiago* (1969) 71 Cal.2d 18 [76 Cal.Rptr. 809, 453 P.2d 353].) ■ It has been consistently held that circumstances short of probable cause to arrest justify an investigation. ■ The officers in this case unquestionably had the right to act upon the reported criminal activity of defendant by investigating further. (*People* v. *Superior Court, supra,* 261 Cal.App.2d 687, 689.)

The scream of the nurse, combined with prior knowledge that defendant may have swallowed contraband, justified the officers' entry of the emergency room whether it be considered public or private. (See *People* v. *De Santiago, supra,* 71 Cal.2d 18, 29; *People* v. *Cooper* (1971) 17 Cal.App. 3d 1112 [95 Cal.Rptr. 471].) It is clear also that at this point time had become of the essence (see *People* v. *Newell* (1969) 272 Cal.App.2d 638, 642 [77 Cal.Rptr. 771]), and once the officers were lawfully in the room, public or private, they had the right to seize the contraband in plain view. (*People* v. *Sandoval* (1966) 65 Cal.2d 303, 308 [54 Cal.Rptr. 123, 419 P.2d 187]; *People* v. *Yeoman* (1968) 261 Cal.App.2d 338, 346 [67 Cal. Rptr. 869].)

We reject also defendant's contention that the doctor and nurse in the emergency room were agents of the police. They were there, it is clear, to offer treatment to defendant at his request and not as emissaries of the police primarily engaged in the collection of evidence for the prosecution. (See *People* v. *Houle* (1970) 13 Cal.App.3d 892, 895-896 [91 Cal.Rptr.

874]; *People* v. *Baker* (1970) 12 Cal.App.3d 826, 833-835 [96 Cal.Rptr. 760]; *People* v. *Cheatham* (1968) 263 Cal.App.2d 458, 461-462 [69 Cal. Rptr. 679]; cf. *Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 102-103 [73 Cal.Rptr. 575, 447 P.2d 967].)

The judgment is affirmed.

Friedman, Acting P. J., and Regan, J., concurred.

A petition for a rehearing was denied December 13, 1971, and appellant's petition for a hearing by the Supreme Court was denied January 13, 1972.