[L. A. No. 23513. In Bank. Mar. 18, 1955.]

FRANK BOMPENSIERO, Petitioner, v. SUPERIOR
COURT OF SAN DIEGO COUNTY et al., Respondents.

Augustine, Bryans, Ragen & O'Connor and Frank Desimone for Petitioner.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), Barton C. Sheela, Jr., and Jack R. Levitt, Deputy District Attorneys, for Respondents.

EDMONDS, J.—By this proceeding in prohibition, Frank Bompensiero challenges the jurisdiction of the superior court to try him upon an indictment which names him as one of several persons who participated in the acceptance of bribes by a public official. He questions the sufficiency of the indictment to charge, and of the evidence before the grand jury to establish, the alleged crimes. He also attacks the trial judge's action in striking from the record a statement disputing the qualification of the judge to rule upon preliminary motions.

According to the evidence before the grand jury, Charles E. Berry was District Liquor Control Administrator of San Diego and Imperial Counties. It was the practice of the Board of Equalization to rely upon the recommendation of the district administrator as to the issuance of a new on-sale liquor license. Berry was the sole official in the district empowered to make such a recommendation.

Several owners of cafés or restaurants in the district testified that they paid substantial sums of money in excess of the statutory fee to obtain a new license. In a typical transaction the owner, having made unsuccessful application to the office of the district administrator, would contact a third party intermediary who assertedly could arrange to have the license issued. Upon payment to that person of several thousand dollars, the owner was instructed to renew his application with the assurance that a license would be forthcoming. After a new application, the license issued through normal channels.

Several persons were named in the indictment with Bompensiero as having acted as intermediary between Berry and the restaurant owners. However, in only one transaction is Bompensiero directly linked with the granting of a license. The evidence in that regard is as follows:

In the winter of 1950, Gillenberg approached Provart, an employee in the district administrator's office, and discussed the possibility of obtaining a seasonal on-sale license. After two or three of such conversations, Provart spoke to Berry about the matter. They agreed that Gillenberg could qualify for a license, but Provart was instructed to tell him it would cost $5,000 to have it issued. A counterproposal of $3,500 was made to Provart and conveyed to Berry. They discussed the advisability of having Bompensiero "talk to" Gillenberg, and Provart was told to tell Gillenberg that "Frank will come and see him."

A man who identified himself as "Frank B." called upon Gillenberg and told him he could get a license but it would cost $5,000. When Gillenberg expressed doubt, he was told to ask Provart if "Frank B. is all right and if I know what I am talking about." Provart assured him that Frank B. could be depended upon.

A short time later, Gillenberg made application for a seasonal license. Two or three weeks passed without action upon it. He then received a telephone call instructing him to meet Frank B. in the lobby of a designated hotel and to have the money with him. There he met the man previously identified to him as Frank B., and they discussed payment. A cashier's check for $5,000 at first was refused, but after further conversation the check, which when presented to the grand jury bore the indorsement "Frank Bompensiero," was accepted. The license was issued in April, 1951, and soon afterwards, Berry gave Provart $400 as his share of the "Gillenberg deal."

Gillenberg had been told by Bompensiero that after a year from the time the seasonal license would be issued, he could reapply and receive a general license. Such an application was made by Gillenberg in October, 1952. After about three weeks in which no action upon the application was taken, a man identifying himself as Bennett called upon Gillenberg. Bennett told him he could obtain a general license only after payment of $2,500. Gillenberg agreed and paid the amount to Bennett in cash. A few days later he reapplied for the general license, and it was issued.

The indictment was returned on September 1, 1954. In Count I, Bompensiero and several other persons are accused of "Conspiracy to Commit the Crime of Asking and Receiving Bribes by a Public Officer" in that they "within 3 years last past . . . did agree to ask and receive bribes on behalf of Charles Berry." Eight overt acts in furtherance of the alleged conspiracy are asserted, including Bompensiero's instruction to Gillenberg, on February 27, 1951, to apply for a seasonal license and Bennett's demand for $2,500 for a general license made on October 25, 1952.

In Count X, it is alleged that Bompensiero and others on April 3, 1951, "did ask and agree to receive" a bribe from Gillenberg upon an understanding that the vote, opinion or action of Berry upon matters officially before him would be influenced. A similar charge is made in Count XI, in which it is asserted that Bompensiero and others "did ask and agree to receive a bribe" from Gillenberg on October 25, 1952. The indictment also included several other charges against Bompensiero.

When arraigned, Bompensiero moved to quash the indictment and filed a written demurrer to it. All of the counts against him were dismissed except Counts I, X and XI, with regard to which his motion was denied and the demurrer overruled. He then filed an "Affidavit and Application for Removal of Trial Judge." The court ordered the document stricken on the ground that it was frivolous and sham.

As grounds for issuing the writ of prohibition Bompensiero contends that the trial judge exceeded his jurisdiction in striking the "statement and affidavit" from the record. He also argues that the evidence before the grand jury is insufficient to establish probable cause for believing him guilty of the offenses charged in Counts I and XI. Count X, he asserts, on its face shows the bar of the statute of limitations.

■ The ground of asserted disqualification of the trial judge is "personal bias and prejudice" against Bompensiero, allegedly demonstrated by two statements made by him while presiding over a separate trial of some of the persons named in the indictment. In that proceeding, Bompensiero was called as a witness for the prosecution and refused to answer on the ground that his testimony might tend to incriminate him. Several other witnesses were called and claimed the same privilege. During arguments upon a motion for a new trial, the trial judge remarked that he had "believed the witnesses for the prosecution" and expressed the opinion that

"if the Board of Equalization wants to do their duty, I think what they should do, instead of picking on these fellows that came in here, they should also revoke the licenses of those that were called before a body, under oath, and refused to testify on the ground that whatever testimony they might give would tend to incriminate them." Bompensiero asserts that he holds a liquor license and thus is in the category mentioned in the latter statement.

These remarks, made in a criminal prosecution in which Bompensiero was only indirectly involved and without indication that he was being singled out, show so little basis for claiming personal bias or prejudice against Bompensiero as to justify the conclusion that the charge of disqualification is sham and frivolous. In that circumstance, the trial judge was not in error in striking the statement and affidavit. (*Cf. People* v. *Darby*, 114 Cal.App.2d 412, 439 [250 P.2d 743]; *People* v. *McCullough*, 100 Cal.App.2d 101, 111 [223 P.2d 37].) ■ There is also another basis for the order. Section 170 of the Code of Civil Procedure requires that, in a court of record, a statement of disqualification of the trial judge "shall be verified by oath in the manner prescribed by section 446 of this code for the verification of pleadings." Bompensiero's statement was not verified and, upon that ground, is formally defective and was properly stricken out. (*Cf. People* v. *Kirk*, 98 Cal.App.2d 687, 693 [220 P.2d 976].)

With regard to the sufficiency of the evidence to support the indictment, Bompensiero urges that Count I charges only a single, general conspiracy to ask for or receive bribes on behalf of Berry. As he views the evidence before the grand jury, it does not show that he conspired with any of the other persons accused of being intermediaries for Berry, but connects him only with Berry and Provart. The count may not reasonably be construed as charging a series of isolated conspiracies, he argues, but even if it may be so read, the only one which includes him terminated more than three years before the indictment was returned and is barred by section 800 of the Penal Code.

■ Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Nagle*, 25 Cal.2d 216, 222 [153 P.2d 344].) An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused

184

is guilty of it. (*Lorenson* v. *Superior Court*, 35 Cal.2d 49, 56, 59 [216 P.2d 859]; *cf. Greenberg* v. *Superior Court*, 19 Cal. 2d 319, 322 [121 P.2d 713].)

 The evidence before the grand jury presents a close question as to whether it shows probable cause to believe a general conspiracy existed and that Bompensiero was a part of it. The similarity of manner in which contact was made with the restaurant owners and the bribery accomplished tends strongly to suggest a common plan of participation, although that evidence alone probably would not show Bompensiero's connection with it. However, Berry's discussion with Provart concerning the advisability of having Bompensiero ''talk to'' Gillenberg suggests some reason to suppose he would agree to do so, possibly because he had acted in a similar capacity previously. Bompensiero's statement to Gillenberg in regard to the issuance of a general license after a year implies knowledge of the manner in which Berry and his associates generally operated. Also, in each case the bribe given for a general license was either $7,000 or $7,500; the requirement that Gillenberg pay an additional $2,500 for the general license after paying $5,000 for the seasonal one, was consistent with this pattern.

 The rule governing the sufficiency of the evidence to justify a suspicion of a conspiracy has been summarized as follows: ''Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. '[I]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole.' '' (*Lorenson* v. *Superior Court, supra,* 35 Cal.2d 57-58.) The grand jury was justified in the belief that each of the transactions in which a bribe was accepted was part of a single general conspiracy to invoke a bribe for each new liquor license issued throughout the district.

 In this situation, the prosecution of the crime charged in Count I is not barred. Proof that one of the overt acts in furtherance of the conspiracy occurred after the time before which the statute of limitations would be a bar is

sufficient, and evidence of acts occurring before that time may be received to show the conspiracy. (*People* v. *Gordon,* 71 Cal.App.2d 606, 629 [163 P.2d 110].) Here, several overt acts are alleged to have occurred within three years prior to the date the indictment was returned.

■ Bompensiero correctly contends that there is no direct evidence which connects him with the offense charged in Count XI. However, since a general conspiracy reasonably may be supposed to have existed, prosecution under this count may proceed upon the theory that a criminal offense in furtherance of the conspiracy is charged.

Bompensiero argues that under section 800 of the Penal Code,* the applicable period of limitation for the offense charged in Count X is three years. He points out that it is there alleged that the offense was committed on or about April 3, 1951, more than three years preceding the return of the indictment. The position of the attorney general is that the six-year period specified for "the acceptance of a bribe by a public official or a public employee" is applicable.

■ Count X does not charge that he *accepted* a bribe, but only that he "did ask and agree to receive" a bribe. However, the offense charged in that count is in the language of section 68 of the Penal Code, which in turn is similar in wording to other provisions which prescribe punishment for a public official who "asks, receives, or agrees to receive" a bribe. (*Cf.* Pen. Code, §§ 86, 93, 165.) There is no provision which expressly makes punishable "the acceptance of a bribe by a public official or a public employee." Reasonably construed, section 800 refers to those statutes under which a public official who "asks, receives, or agrees to receive a bribe" may be punished.

Another argument is that Bompensiero is not a "public official or a public employee," and is charged only with aiding and abetting a public official to receive a bribe. Construed strictly in his favor, he asserts, section 800 may not be read as prescribing the six-year period for one, not a public official, who merely participates in the receipt of a bribe.

---

*An indictment for any other felony than murder, the embezzlement of public money, the acceptance of a bribe by a public official or a public employee, or the falsification of public records, must be found, and information filed, or case certified to the superior court, within three years after its commission. An indictment for the acceptance of a bribe by a public official or a public employee, a felony, must be found, and the information filed, or case certified to the superior court, within six years after its commission."

In jurisdictions where aiding and abetting the commission of a criminal act is made a distinct offense, the statute of limitations which controls prosecution for the criminal act is held not to apply to the offense of aiding and abetting. The general statute of limitations applicable to ''other offenses'' is held to control. (*Dinklage* v. *State,* (Tex.Crim. App.) 117 S.W.2d 111, 112; *State* v. *Patriarca,* 71 R.I. 151 [43 A.2d 54, 58, 160 A.L.R. 387].) But in the Patriarca case it was specifically stated that a different rule might apply when the Legislature has removed the distinction between one who commits a crime and one who aids in its commission. The court said that it ''must follow the common law, as long as our legislature does not abrogate it and declare accessories before the fact to be principals.'' (P. 58.) And in *State* v. *Bachmeyer,* 247 Wis. 294 [19 N.W.2d 261], it was held that the statute of limitation applicable to the substantive offense applies to one who participates as a principal.

Section 971 of the Penal Code provides in part: ''The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of a felony, is abrogated; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, shall hereafter be *prosecuted, tried, and punished* as principals. . . .'' (Emphasis added.) Reasonably construed, this section expresses a legislative intent to abolish the distinctions made at common law as to the various types of participants in the commission of a crime and to make all of them subject to the same procedural and substantive limitations.

Section 800 of the Penal Code provides no exception to this rule. Contrary to Bompensiero's position, it does not specify a period of limitation based upon the identity of the offender, but differentiates among the types of criminal acts. It places in one category ''any other felony than *murder,* the *embezzlement* of public money, the *acceptance* of a bribe by a public official or a public employee, or the *falsification* of public records.'' (Emphasis added.) It places in another category the ''acceptance of a bribe.'' Because Bompensiero may be prosecuted, tried and punished as principal for the criminal act of ''acceptance of a bribe by a public official,'' Count X of the indictment is not barred by limitation.

The peremptory writ is denied and the alternative writ discharged.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

Count I charges Bompensiero and several other persons with a general conspiracy to commit the crime of asking and receiving bribes by a public officer. Count X charges that Bompensiero and others on April 3, 1951, did ask and agree to receive a bribe. Count XI alleges that Bompensiero and others on October 25, 1952, did ask and agree to receive a bribe.

I do not believe that there was evidence sufficient to support a reasonable belief that Bompensiero was involved in a general conspiracy as alleged in Count I, nor that there was any evidence or inference connecting Bompensiero with the crime alleged in Count XI.

To show that there was sufficient evidence against petitioner the majority opinion states: "The similarity of manner in which contact was made with the restaurant owners and the bribery accomplished tends strongly to suggest a common plan of participation, although that evidence alone *probably would not show Bompensiero's connection with it.* However, Berry's discussion with Provart concerning the advisability of having Bompensiero 'talk to' Gillenberg suggests some reason to suppose he would agree to do so, possibly because he had acted in a similar capacity previously. Bompensiero's statement to Gillenberg in regard to the issuance of a general license after a year implies knowledge of the manner in which Berry and his associates generally operated. Also, in each case the bribe given for a general license was either $7,000 or $7,500; the requirement that Gillenberg pay an additional $2,500 for the general license after paying $5,000 for the seasonal one, was consistent with this pattern." (Emphasis added.)

In other words, it is held that the similarity of the plan of operation of bribery is "probably" not enough to show petitioner's connection with it, then that connection is purportedly shown by reliance on such similarity. The majority points to only two other bits of evidence to fortify the similarity in evidence, namely: (1) That Berry's discussion with Provart about having petitioner talk to Gillenberg,

the person who was to pay the bribe money, indicates petitioner would talk to Gillenberg, and (2) petitioner's statement to Gillenberg that application should be made for a general license by Gillenberg after a year. Those two items of evidence are not sufficient, either separately, together or in conjunction with the admittedly weak similarity of manner of contacting the bribers. It seems unreasonable to say that because Berry and Provart, his assistant, discussed the possibility of having petitioner speak to Gillenberg about the bribe, a conspiracy is proven either between Berry and petitioner or among petitioner and the other persons working for Berry. That a person (Berry) will talk to another person (petitioner) about committing a crime (bribery) may indicate that the former thinks the latter will be receptive to the proposition but it does not show that the latter would in fact be receptive to it or would conspire with him or with other persons in carrying out Berry's orders. If it did it would mean that if one person thinks that another would commit a crime, then there is evidence that the other would agree to commit it. It is not only no proof of the conspiracy but it does not even raise a reasonable suspicion.

Petitioner's statement to Gillenberg that the latter should apply for a general license after operating for one year under the seasonal license does not indicate "knowledge of the manner in which Berry and his associates generally operated." None of the other evidence in this case makes any reference to seasonal licenses. There is not the slightest intimation in the record that it was the *general practice* of Berry and the other defendants to arrange for the issuance of a seasonal license, followed in one year by the issuance of a general license. Indeed, this very fact—that Gillenberg was to get a seasonal license only—is an indication of *dissimilarity* between the acts in which Bompensiero participated and any other acts of bribery to obtain a license. It is evidence tending logically to a belief that there was *no* general conspiracy involving petitioner. Gillenberg testified, ". . . this Frank B. told me that I would get a general license after operating a year. . . . He said that I would *automatically* get a general license and for me to go in and apply after I had operated a year which I did, you see, and, of course, *I found that out not to be true* after I went in to get the license." (Emphasis added.) The logical inferences which could arise from such events would be: (1) That Frank B. thought that the population of Jacumba, the location of

Gillenberg's establishment, would be such in one year that he, Gillenberg, could qualify for a general license; or (2) that Frank B. believed that it was the practice of the Board of Equalization to issue a general license after one year's operation under a seasonal license; or (3) that Frank B. believed that the $5,000 payment would satisfy Berry, and that the general license would be issued without the necessity of further bribery, i.e., that Frank B. was in woeful ignorance of "the manner in which Berry and his associates generally operated."

The fact that an additional bribe of $2,500 was obtained before the general license was issued to Gillenberg, bringing the total bribe to $7,500, again lacks any logical reference to petitioner. Not one word of evidence was offered which directly or by inference connected petitioner with this later act of bribery. In one transaction Gillenberg paid $5,000 to obtain a seasonal license. Later, desiring a general license, he paid an additional $2,500. The "going rate" of bribery for a general license was $7,500. These facts illustrate nothing more than the time-worn and probably dubious maxim that there is "Honor even among thieves." They indicate that Berry did not want to charge Gillenberg more than the going rate for a general license, for fear that Gillenberg would complain of the overcharge in too loud a voice. Again, I feel that it should be emphasized that no evidence was offered which in any way connected petitioner with the $2,500 bribe in October, 1952.

Even if it is assumed that there was sufficient evidence to show that petitioner conspired with Berry, there is no evidence which even remotely connects petitioner with the other persons working for Berry, and thus there is no evidence showing a general conspiracy. It is conceded by the majority that to constitute a general conspiracy, there must have been an agreement not just among Berry, petitioner and Gillenberg, but also among petitioner and the *other persons* working for Berry. It appears that Berry, being in a position to give or refuse licenses had various persons whom he used to solicit bribes from parties desiring licenses. There is no evidence indicating any connection among those persons other than that they occasionally worked for the same person, Berry. The only reasonable inference is that there is no agreement among those persons, since Berry, for his own protection, would keep his various henchmen in ignorance of his operations as between each other.

It seems clear to me, therefore, that the Grand Jury of San Diego County did not have before them sufficient evidence to justify a reasonable belief that petitioner was guilty of the crimes alleged in Counts I and XI of the indictment.

The major point remaining for discussion is whether the prosecution of Bompensiero for the offense charged in Count X is barred by the statute of limitations (Pen. Code, § 800).

The majority opinion points out two specific facts by reason of which it should have held, but did not, that such prosecution *is* barred by the statute of limitation: (1) "Count X does not charge that he [Bompensiero] accepted a bribe"; (2) ". . . Bompensiero is not a 'public official or a public employee.'" Penal Code, section 800, imposes a three-year limitation on the bringing of an indictment for any other felony than murder, the embezzlement of public money, *the acceptance of a bribe by a public official or a public employee,* or the falsification of public records. A six-year limitation is imposed on the bringing of an indictment for the *acceptance of a bribe by a public official or a public employee.*

In its decision on the two points enumerated above, the majority has employed a process of reasoning from one statute to another to arrive in the end at what it describes as a reasonable construction of Penal Code, section 800. I do not quarrel with the "reasonableness" of its construction. The point which I desire to emphasize is that this is not the only possible construction of the statute; and, as this court has *repeatedly* held in the past, "When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. In other words, criminal statutes will not be built up 'by judicial grafting upon legislation. . . . [I]t is also true that the defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.'" (*People* v. *Ralph,* 24 Cal.2d 575, 581 [150 P.2d 401]; *People* v. *Valentine,* 28 Cal.2d 121, 143 [169 P.2d 1, 167 A.L.R. 675]; *In re McVickers,* 29 Cal.2d 264, 278 [176 P.2d 40]; *In re Bramble,* 31 Cal.2d 43, 51 [187 P.2d 411]; *People* v. *Chessman,* 38 Cal.2d 166, 182 [238 P.2d 1001]; *Ex parte Rosenheim,* 83 Cal. 388, 391 [23 P. 372]; *People* v. *Sayre,* 26 Cal.App.2d Supp. 757, 761 [70 P.2d 546].)

The question here presented is one of first impression in this state. Only one case (*State* v. *Bachmeyer,* 247 Wis. 294

[19 N.W.2d 261, 263]) is cited which reaches the same result as the majority opinion reaches here. We are *not* bound by that case, decided pursuant to the law of a sister state. I feel that we are bound by the long established, eminently just policy set out in the cases decided in our own state, by this very court.

The writ of prohibition sought by petitioner should be granted.

Petitioner's application for a rehearing was denied April 13, 1955. Carter, J., was of the opinion that the application should be granted.