[Crim. No. 4617.　First Dist., Div. One.　June 23, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. ROY HERNANDEZ GOVEA, Defendant and Respondent.

[Crim. No. 4618.　First Dist., Div. One.　June 23, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. JOE VILLEGAS COTA et al., Defendants and Respondents.

[Crim. No. 4619.　First Dist., Div. One.　June 23, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. CANDIDO SANCHEZ CORONA et al., Defendants and Respondents.

[Consolidated Appeals.]

Stanley Mosk and Thomas C. Lynch, Attorneys General, Edward P. O'Brien, Derald E. Granberg and Albert W. Harris, Jr., Deputy Attorneys General, for Plaintiff and Appellant.

Eugene Epstein and Robert J. Pia, under appointment by the District Court of Appeal, Cominos & Shostak and Muller, Pia & Simmons for Defendants and Respondents.

SULLIVAN, P. J.—Defendants were charged in three indictments, all returned on February 14, 1964, with various violations of the narcotics laws. In each of the above causes the motion of the respective defendant or defendants to set aside the indictment was granted (Pen. Code, § 995) and the People appeal.

In 1/Crim. 4617 defendant Roy Hernandez Govea was charged with possession of marijuana (Health & Saf. Code, § 11530). In 1/Crim. 4618 defendants Joe Villegas Cota and Sylvester Villegas Cota were charged with possession of heroin (Health & Saf. Code, § 11500). In 1/Crim. 4619, defendants Candido Sanchez Corona and Max Galviz Macias

were charged with possession of marijuana (Health & Saf. Code, § 11530) in count one and possession of heroin (Health & Saf. Code, § 11500) in count two. All of the offenses were charged as having been committed on January 30, 1964, and, although made the subject of three separate proceedings in the court below, can be set forth in a single statement of facts and disposed of here by considering issues common to two or more of the appeals rather than by discussing each appeal independently.

On January 30, 1964, a search warrant was issued to Detective Charles Walker of the Salinas Police Department by a judge of the Municipal Court of the Salinas Judicial District, County of Monterey, authorizing the immediate search in the daytime or in the nighttime of the premises located at 53 Hacienda Street, Salinas, occupied by Joe Cota, for heroin, marijuana or other contraband narcotic substances.

Walker's affidavit for the warrant set forth the following facts as constituting probable cause to believe that Cota was then in the possession of narcotics on the premises: That Joe Cota was a known narcotics violator with previous convictions for sale and possession of marijuana; that on January 27, 1964, in the nighttime, Walker went to Cota's above premises with "Operator X," thoroughly searched said operator before the latter entered the premises, found no narcotic substances on his person, kept him under constant surveillance thereafter, observed Operator X enter the premises and remain there for several minutes, and then received from him a substance which was later determined to be heroin; that while Operator X was inside the premises, Walker overheard by means of an electronic hearing device a transaction for the sale of heroin; that Walker knew that Joe Cota had been living at the above address for two months; and that said operator informed him that Joe Cota had provided the heroin and identified a picture of the Joe Cota known by Walker.

At the same time[1] a similar search warrant was issued to Detective Walker by the same judge authorizing the search of the premises located at 114 Carr Street, Salinas, occupied by Willie Mendoza. Walker's affidavit for this warrant was almost identical to his affidavit for the Cota warrant. The only substantial difference was that it alleged that Mendoza was a known narcotics user, recently returned from the California

[1]The affidavit for the Mendoza search warrant was filed at 1:19 p.m. and the affidavit for the Cota search warrant at 1:20 p.m.

Narcotics Rehabilitation Center where he underwent treatment for addiction to heroin; and that the transaction for the sale of heroin between "Operator X" and Mendoza took place on January 2, 1964, in the nighttime on Mendoza's above premises.

At about 6:30 p.m. on January 30, the day the warrants were issued, State Narcotics Agent Ojeda, Salinas Police Sergeant Rodman and Deputy District Attorney Chang went to Cota's residence on Hacienda Street and, using field glasses, proceeded to keep it under surveillance.[2] Ojeda testified before the grand jury that at about 7:15 p.m. he saw a car drive into Cota's driveway, a person alight from the passenger side and enter the back door of the residence, another person emerge from the back door and appear to talk with and hand something to the driver of the car, the original passenger return to the car and the car drive away.

Ojeda, together with Rodman, pursued the car and, after sounding a siren, brought it to a stop at a nearby intersection. They then took the two occupants out of the car, searched them thoroughly, and, finding no contraband on their persons, searched the automobile. Ojeda found a small white paper bindle in the center of the front seat. The contents of the bindle were later identified as heroin. The driver of the car was defendant Corona and the passenger was defendant Macias.

When the officers found the paper bindle they asked Corona and Macias if each knew what it was, but both defendants denied knowledge or ownership of the contraband. The two suspects were then taken back to the Cota residence, whereupon Corona admitted that the bindle contained heroin, that it belonged to him and that he had brought it from Mexicali.

Meanwhile, the car in which Corona and Macias had been arrested was impounded by a police officer who had been instructed to take it to the police department parking lot, to lock it and to watch it. Ojeda and Sergeant Rodman unlocked the car about six hours later, searched it and found two small brown paper bags and one waxpaper bag, all of which contained marijuana.

Agent Ojeda testified before the grand jury that he pursued and arrested the two men because he believed a felony had taken place in the Cota residence; that from his experience and many observations of "passes" of narcotics, he believed that

---

[2]Surveillance was conducted from a roadway about 150 yards from Cota's house across a vacant area affording a clear, direct view.

a sale or delivery of narcotics had occurred at the time the car was driven up to the Cota home and something appeared to be delivered to it from the premises; and that he based this belief in part on previous observations and a previous search of the Cota home, previous "run-ins" with all the Cota brothers and reliable information from other officers that there was narcotics traffic in the Cota home.

As already stated, the grand jury returned an indictment (in 1/Crim. 4619) charging Corona and Macias with possession of both marijuana and heroin.

About 30 minutes after Corona and Macias were stopped and searched, the Cota residence was entered and searched. Detective Walker testified before the grand jury that he and other officers[3] went to the residence and Agent Armenta knocked on the back door. Joe Cota opened the door, Armenta informed him that he was a police officer and Walker and Armenta went inside. Defendant Sylvester Cota asked Walker if he had a search warrant and Walker replied that he did, showing him the warrant which he had in his possession. Walker then started searching the house. He found two or three packages in the kitchen containing a hypodermic needle, a syringe and a charred spoon used by narcotics addicts for injecting narcotics.

Captain Ashton testified before the grand jury that immediately after Walker entered the house, he entered through the front door. He walked over to a couch where Sylvester Cota and his father were sitting, reached over the couch, picked up a coat and searched it. He found a cellophane type of paper or bag containing a standard type of paper folded as a bindle containing a substance later identified as heroin. Ashton asked who was the owner of the coat, Sylvester Cota said the coat was his, but the father (Alejandro Cota) said, within Joe Cota's hearing distance, that the jacket belonged to Joe. Joe Cota himself told Mr. Chang at that time that the coat was his.

Agent Armenta testified that in the course of his search of the house he found on a couch in the living room a brown bag with a plastic or waxpaper bag in it containing marijuana. He overhead Joe Cota speak to Sylvester in Spanish telling him that he, Sylvester, should take the blame for everything. Sylvester had announced, either before or after the conver-

[3]State Narcotics Agent Ojeda and Armenta, parole Agent Smith, Sergeant Rodman, Salinas Police Captain Ashton and Deputy District Attorney Chang.

sation in Spanish with his brother, that the jacket was his, that everything of a narcotic nature on the premises was his. Later on Joe spoke in Spanish to everyone present, saying that the "other two defendants [Corona and Macias] had better not say anything regarding any of the narcotics if they knew what was good for them." Armenta also testified that Joe Cota, after being taken into custody, "appeared to pop something into his mouth and swallow it" and that, upon being questioned about this, Cota said "that he was only fooling, that he didn't really put anything in his mouth, he was just trying to give his brother Sylvester a chance to get rid of anything that might be in the house."

Armenta further testified that he searched an upstairs bedroom which the Cota boys' mother said was used by the boys. He found strips of paper resembling those ordinarily used as bindles and a thin copper wire which is usually used to keep a hypodermic needle from getting clogged.

As already stated, the grand jury returned an indictment (in 1/Crim. 4618) charging both Joe and Sylvester Cota with possession of heroin.

In the early hours of the morning on January 31, 1964, Agent Armenta and other officers[4] went to 114 Carr Street in Salinas to execute the search warrant issued for the premises at the address occupied by Willie Mendoza. As a result of this search Mendoza was arrested and indicted for possession of heroin.[5]

Defendant Govea, who was Mendoza's brother-in-law, his wife (Mendoza's sister) and their children also lived at 114 Carr Street. The record does not indicate with clarity who owned or rented the house.[6]

Agent Armenta testified before the grand jury that he searched the bedroom area of the house in which defendant

---

[4]Agent Ojeda, Detective Walker and Sergeant Rodman.

[5]Mendoza's motion to set aside the indictment was granted at the same time as the court granted similar motions in the other cases. Because of Mendoza's death, the People abandoned their appeal from such order (1/Crim. 4620) and we entered an order dismissing the appeal.

[6]The record in 1/Crim. 4620 to which Govea's counsel (who also represented Mendoza) makes reference discloses that Armenta asked Mendoza which portion of the house he occupied and Mendoza replied that he used the front area which appeared to be used as a bedroom. The instant record (1/Crim. 4617) discloses testimony by Armenta that he was at the home of Roy H. Govea at 114-D Carr Street. On the other hand, on the hearing of Govea's motion under § 995, the district attorney in response to the court's inquiry stated that Govea was in Willie Mendoza's house and also stated that Govea was "in the same house that Mr. Mendoza was in." Govea's counsel took no issue with these statements.

Roy Govea was apparently sleeping. Armenta searched Govea's clothes, found two handrolled cigarettes rolled with brown cigarette paper and wrapped in tinfoil, asked Govea what they were and was told by Govea that the cigarettes contained marijuana. Sergeant Rodman found a 1-pound MJB coffee can containing marijuana which Govea said belonged to him after he was asked by Armenta if all the marijuana was his. Govea admitted that he had purchased it in Salinas for $40. Armenta also stated that he had reliable information that gave him cause to believe that a felony was being committed in the house when he entered but gave no explanation of this statement.

The grand jury returned an indictment (in 1/Crim. 4617) charging Govea with possession of marijuana.

On March 3, 1964, the trial court granted the several motions to set aside the indictments on substantially the same grounds.[7] Essentially the court's action rested on a determination that, exclusive of all evidence produced by illegal searches, there remained no competent evidence before the grand jury of the commission by defendants of the various crimes charged and that therefore defendants had been indicted without reasonable or probable cause. (Pen. Code, § 995; see *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713]; *Lorenson* v. *Superior Court* (1950) 35 Cal.2d 49, 55-57 [216 P.2d 859]; *Callan* v. *Superior Court* (1962) 204 Cal.App.2d 652, 661-662 [22 Cal.Rptr. 508].) On these appeals, the controversy revolves about the legality of the various searches. Generally speaking, the Attorney General takes the position that all of the searches were legal and that the evidence obtained thereby established probable cause for the indictments. The several defendants take just the opposite position.

Before we take up these central issues we dispose of an argument advanced by defendants Joe and Sylvester Cota and defendant Corona in support of the trial court's action. These three defendants contend[8] that the respective indict-

---

[7]The motion of Govea because of ''illegal search and seizure''; the Cotas, ''illegal search and seizure and that search warrant was not properly issued''; Macias, ''illegal search and seizure and insufficient evidence to show probable cause''; Corona, ''illegal search and seizure''; and Mendoza (not here involved), ''illegal search and seizure and that search warrant was not properly issued.''

[8]The same counsel appear for the Cotas in 1/Crim. 4618 and for Corona in 1/Crim. 4619. In each appeal, the argument on the point is word for word the same.

ments against them were not presented to the court in the manner prescribed by Penal Code section 944.[9] They argue that in each instance the grand jury returned an indictment charging possession of *marijuana,* that there was no indictment charging possession of *heroin,* and that there was no basis for a trial on the latter charge.

In fashioning this argument, defendants appear to seize upon a discrepancy between certain statements of the court at the conclusion of the grand jury proceedings and the face of the pertinent indictments in the instant records (1/Crim. 4618 and 4619). The transcripts[10] of the oral proceedings of the grand jury had on February 14, 1964, reveal that after concluding its deliberations on several cases the grand jury returned into court whereupon the court noted the return of several indictments signed and presented by the foreman. As we read the record, the judge then proceeded to identify or refer to the several indictments presented, stating, *inter alia*: "[I]ndictment returned to the Court, Candido Corona, Max Macias, violation of Section 11530 of the Health and Safety Code, Possession of Marijuana, signed by the Foreman of the Grand Jury, and still another, Joe Villegas Cota and Sylvester Villegas Cota, a violation of Section 11530 of the Health and Safety Code, signed by Russell S. Hansen, Foreman of the Grand Jury, as is the case of all the others."

The argument which defendants attempt to draw from this incident is utterly devoid of merit. The real question here is whether or not the indictments were presented and filed in compliance with section 944. The record shows that they were. The pertinent clerk's transcripts contain the indictments filed on February 14, 1964, disclosing on their face full compliance with section 944.[11] As previously stated at the beginning of this opinion, the indictment against the Cotas charges possession of *heroin* not marijuana and the indictment

[9]Pen. Code, § 944 provides: "An indictment, when found by the grand jury, must be presented by their foreman, in their presence, to the court, and must be filed with the clerk."

[10]The transcripts of the oral proceedings had upon the return of the grand jury to the court, cover the presentation of all indictments and are of course identical.

[11]Each indictment bears an indorsement "A True Bill," the signature of the foreman, the file stamp of the county clerk, and the following conclusionary language over the signature of the clerk of the court: "Presented by the Foreman of the Grand Jury, in the presence of the Grand Jury, to the Superior Court of the State of California, in and for the County of Monterey, Department No. 1, and filed as a record of said Court this 14th day of February, A.D. 1964."

against Corona and Macias charges possession of *heroin* (in count two) as well as possession of marijuana (in count one). The indictments themselves are the best evidence of the public offenses charged therein and must control over the judge's erroneous reference to their contents, obviously occurring through inadvertence in the course of identifying a number of indictments before him. Defendants cite no authority supportive of their unique argument. They rely on *Renigar* v. *United States* (4th Cir. 1909) 172 F. 646, 658 for the proposition that a valid indictment found and presented according to the settled usage and established mode of procedures is a jurisdictional prerequisite to trial for a public offense. The instant indictments are valid.

We turn to consider the legality of the two search warrants. The Attorney General contends that the searches which produced the narcotics against Govea and the Cota brothers were made pursuant to valid search warrants referred to by us *supra*. Govea contends that the search warrant for the premises at 114 Carr Street was invalid as to him since it authorized a search only of Mendoza's premises and additionally that in any event the affidavit for the warrant did not set forth facts sufficient to establish probable cause for its issuance or a showing of good cause for its service in the nighttime. The Cotas make the same attack on the sufficiency of the affidavit for the search warrant directed to their premises at 53 Hacienda Street.

"A search warrant may be issued by a magistrate only upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property to be seized and the place to be searched. (Cal. Const., art. I, § 19; Pen. Code, §§ 1523, 1525.)" (*People* v. *Keener* (1961) 55 Cal.2d 714, 719 [12 Cal.Rptr. 859, 361 P.2d 587].)[12] The affidavit for the warrant "must set forth the facts tending to establish the grounds of the application, or probable cause for believing that they exist." (Pen. Code, § 1527.) The magistrate must issue the warrant only if he is satisfied of the existence of the grounds of the application or "that there is

[12]Pen. Code, § 1523 provides: "A search-warrant is an order in writing, in the name of the people, signed by a magistrate, directed to a peace-officer, commanding him to search for personal property, and bring it before the magistrate."

§ 1525 provides: "A search-warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched."

probable cause to believe their existence, . . ." (Pen. Code, § 1528.)

■ In determining the sufficiency of an affidavit for the issuance of a search warrant, the standard or test of probable cause is approximately the same as that applicable to an arrest without a warrant, a commitment by a magistrate or an indictment by a grand jury (*People* v. *Aday* (1964) 226 Cal.App.2d 520, 532-533 [38 Cal.Rptr. 199]; *Williams* v. *Justice Court* (1964) 230 Cal.App.2d 87, 94 [40 Cal.Rptr. 724]), namely, "such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Nagle* (1944) 25 Cal.2d 216, 222 [153 P.2d 344]; in accord: *Jackson* v. *Superior Court* (1965) 62 Cal.2d 521, 525 [42 Cal.Rptr. 838, 399 P.2d 374]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 532 [30 Cal.Rptr. 538, 381 P.2d 394]; *Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529]; *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459, 462 [15 Cal. Rptr. 65, 364 P.2d 241]; *Robison* v. *Superior Court* (1957) 49 Cal.2d 186, 188 [316 P.2d 1]; *Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 7-8 [291 P.2d 929]; *Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 183 [281 P.2d 250]; *Callan* v. *Superior Court, supra,* 204 Cal.App.2d 652, 661.) ■ Facts stated in the affidavit are relevant on the issue of probable cause, irrespective of whether they are stated positively or on information and belief. (*People* v. *Acosta* (1956) 142 Cal. App.2d 59, 62-63 [298 P.2d 29]; *Arata* v. *Superior Court* (1957) 153 Cal.App.2d 767, 773 [315 P.2d 473]; *Dunn* v. *Municipal Court* (1963) 220 Cal.App.2d 858, 870 [34 Cal. Rptr. 251].) ■ The supporting evidence is not limited to that which would be admissible at the trial on the issue of guilt. (*People* v. *Boyles* (1955) 45 Cal.2d 652, 656 [290 P.2d 535]; *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294 [294 P.2d 36]; *People* v. *Ingle* (1960) 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577], cert. denied 364 U.S. 841 [81 S.Ct. 79, 5 L.Ed.2d 65]; *People* v. *Perez* (1961) 189 Cal. App.2d 526, 532 [11 Cal.Rptr. 456].[13]) ■ As the court said in the last cited case: "Matters which may be taken into account include the past criminal record of the suspected person and his association with known narcotics users [citations], and the fact that a person was found to be in possession of a

---

[13]Disapproved on other grounds in *People* v. *Underwood* (1964) 61 Cal.2d 113, 125 [37 Cal.Rptr. 313, 389 P.2d 937].

narcotic shortly after he left the premises of the suspected person. [Citation.]'' (P. 533.) Generally speaking, in determining whether there is probable cause, each case must be decided on its own facts and circumstances. (*People* v. *Ingle, supra,* p. 412; *People* v. *Perez, supra.*)

Do the affidavits for the two search warrants on their face and as a matter of law contain sufficient competent evidence to support the magistrate's finding of probable cause? (*Arata* v. *Superior Court, supra,* 153 Cal.App.2d 767, 770; *People* v. *Prieto* (1961) 191 Cal.App.2d 62, 68 [12 Cal.Rptr. 577]; *Dunn* v. *Municipal Court, supra,* 220 Cal.App.2d 858, 869.)[14]

 We can upset the warrants only if they fail as a matter of law since ''It is the function of the trier of the facts, not that of a reviewing court, to appraise and weigh the evidence when presented by affidavit as well as when presented by oral testimony.'' (*Arata* v. *Superior Court, supra,* p. 772, fn.; and see *People* v. *Prieto, supra; Dunn* v. *Municipal Court, supra.*)

 We have already set forth the substance of both affidavits of Detective Walker and pointed out that they were practically identical except for differences in the time and place of heroin transactions related therein. In summary they allege: (a) Walker's knowledge that Cota was a known narcotics violator and Mendoza a known narcotics user; (b) Walker's presale search and surveillance of ''Operator X'' who entered the respective premises in the nighttime and emerged shortly thereafter with heroin; (c) Walker's listening in on the sale transaction; (d) the identification made to Walker by Operator X that Cota and Mendoza delivered the heroin; (e) Walker's knowledge that the suspects had lived on the respective premises for two months.

It will be observed that all of the above factual ingredients consist of positive statements by Detective Walker of his own personal knowledge or observations except (d) above which consists of information received by Walker from the operator. This is therefore not a case where the issuance of the warrant rests *solely* upon information secured from an informant not known to be reliable. Nor is the failure of the affidavits to identify the informant by name a fatal defect in the instant case. (*People* v. *Keener, supra,* 55 Cal.2d 714, 721-723.)

---

[14]Defendants are not precluded from attacking the sufficiency of the affidavits as a matter of law because of their failure to pursue the remedies provided by Pen. Code, §§ 1539 and 1540. (*Arata* v. *Superior Court, supra; People* v. *Perez, supra,* 189 Cal.App.2d 526, 531-532; *Dunn* v. *Municipal Court, supra,* p. 867.)

Accordingly, probable cause for the issuance of a search warrant may be based on information furnished by an informant, even though not identified by name, if the supporting affidavit also recites facts indicating that reliance on the information is reasonable. (*Jones* v. *United States* (1960) 362 U.S. 257, 269-272 [80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233]; *People* v. *Keener, supra,* 55 Cal.2d 714, 721; *Williams* v. *Justice Court, supra,* 230 Cal.App.2d 87, 95; *Dunn* v. *Municipal Court, supra,* 220 Cal.App.2d 858, 871; *People* v. *Prieto, supra,* 191 Cal.App.2d 62, 69; *People* v. *Perez, supra,* 189 Cal.App.2d 526, 532-533; *Arata* v. *Superior Court, supra,* 153 Cal.App.2d 767, 772-775; *People* v. *Acosta, supra,* 142 Cal.App.2d 59, 64; see also *People* v. *Barthel* (1965) 231 Cal.App.2d 827, 831-832 [42 Cal.Rptr. 290].) Evidence substantiating reliance by the police on such information may be of different kinds, including *inter alia* the personal knowledge and observations of the officers. (See *People* v. *Prieto, supra,* and cases there collected.)

The affidavits in the instant case satisfy the above requirements. As pointed out, they mainly consist of positive statements of Detective Walker. Indeed from the allegations pertinent to the presale search and surveillance of ''Operator X'' (referred to in (b) *supra*), quite apart from the information obtained from the operator, a reasonably prudent man could conclude that someone on the premises delivered heroin to the operator. As to that portion of the affidavits relying upon information from the operator, it is clear that the facts known to Walker and his own personal observations corroborated the information that Joe Cota and Willie Mendoza had sold heroin to the operator in the nighttime on the pertinent occasions. Considered in their totality, the affidavits contained sufficient facts to lead the issuing magistrate, as a man of ordinary caution or prudence, to believe and conscientiously entertain a strong suspicion that Cota and Mendoza were in possession of heroin.

 Nor were the affidavits insufficient for want of a showing of good cause for the service of the warrants in the nighttime. (Pen. Code, § 1533.[15]) Both affidavits stated that the

---

[15]Pen. Code, § 1533, provides: ''On a showing of good cause therefor, the magistrate may, in his discretion, insert a direction in the warrant that it may be served at any time of the day or night; in the absence of such a direction, the warrant may be served only in the daytime.''

Prior to its amendment in 1961, § 1533 required the magistrate to direct service of the warrant in the daytime ''unless the affidavits are positive that the property is on the person or in the place to be searched, in

respective sales of heroin occurred at night and in private residences. It was therefore reasonable to search the premises in the nighttime when, according to investigation and surveillance, prior sales had taken place and when the suspects were more likely to be on the premises and in possession of narcotics. The above facts constituted a showing of good cause for the insertion by the magistrate in the warrants of a direction that they be served "in the daytime or in the night time."

We turn to Govea's separate contention dealing with the scope of the Mendoza search warrant. The warrant commanded the search of "the premises located at 114 Carr Street, occupied by WILLIE MENDOZA, . . ." The Attorney General contends on his appeal in the Govea case (1/Crim. 4617) that the search which produced the narcotics in Govea's possession was made pursuant to the above warrant. Defendant Govea argues that if the warrant is relied on as authorizing a search of the entire premises at 114 Carr Street, including the bedroom where defendant Govea and his family were, it was in effect a general warrant and void in that it failed to describe the place to be searched with sufficient particularity. He bases his argument on the claim that the search warrant was directed to a multiple family dwelling.[16]

It is essential to the validity of a search warrant that it describe with particularity the place to be searched. (U.S. Const., 4th Amend.;[17] Cal. Const., art. I, § 19;[18] Pen. Code,

---

which case he may insert a direction that it be served at any time of the day or night." Cf. rule 41, Federal Rules of Criminal Procedure, which provides in pertinent part: "The warrant shall direct that it be served in the daytime, but if the affidavits are positive that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time."

[16]Defendant did not make this claim in the trial court. His position there seems to have been that, because the search warrant was invalid as to Mendoza, it was necessarily invalid as to Govea, defendant's counsel contending that under the authority of *People* v. *Ditson* (1962) 57 Cal.2d 415 [20 Cal.Rptr. 165, 369 P.2d 714], "the fruits of the search [of Govea's room] would be illegal if the initial search was invalid, . . ."

[17]U. S. Const., 4th Amend., which is enforceable against the states through the due process clause of the Fourteenth Amendment (*Mapp* v. *Ohio* (1961) 367 U.S. 643, 655, 660 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933] provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[18]Cal. Const., art. I, § 19 provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

§ 1525.[19]) As applied to dwelling houses, the particular "place" required to be described means a single living unit, that is to say the residence of one person or family, and a warrant describing an entire building issued on probable cause for searching only one apartment therein is void. (*United States* v. *Hinton* (7th Cir. 1955) 219 F.2d 324, 326; *United States* v. *Barkouskas* (D.C.Pa. 1930) 38 F.2d 837, 838; *United States* v. *Chin On* (D.C.Mass. 1924) 297 F. 531, 533; *United States* v. *Innelli* (D.C.E.D. Pa. 1923) 286 F. 731, 732-733; *United States* v. *Mitchell* (D.C.N.D. Cal. 1921) 274 F. 128, 130-131.) A warrant directing a search of an apartment house or other dwelling house containing multiple living units is void unless issued on probable cause for searching each apartment or living unit or for believing that the entire building is a single living unit. (*Tynan* v. *United States* (9th Cir. 1924) 297 F. 177, 179; *United States* v. *Hinton*, *supra*, 219 F.2d 324, 326; *United States* v. *Poppitt* (D. C. Del. 1964) 227 F.Supp. 73, 76.)

 In the instant case there is nothing on the face of the Mendoza search warrant indicating that it is directed to premises constituting more than a single living unit. In fact, the warrant is to the contrary and the affidavit for the warrant refers to the designated premises as "consisting of a dwelling house, outbuildings and yard *occupied* by *WILLIE MENDOZA*. . . ." (Italics added.) A reasonable construction of this is that Mendoza occupied the entire premises. We find no basis for defendant's assertion that the warrant was "directed to a multiple family dwelling."

Nor do we find anything elsewhere in the record before us supportive of defendant's somewhat oblique claim that the premises were a "multiple family dwelling" or "boarding house" or that it contained a "separate dwelling of the Goveas." Apart from the warrant, the record does not disclose who was in possession of the premises either as owner or tenant. It does disclose that Mendoza used the front of the house as a bedroom (see fn. 6, *ante*) and that defendant Govea and his family, at least on the night of the search, were using a bedroom. This does not show that the premises were not a

seizures and searches, shall not be violated; and no warrant shall issue, but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

[19]Pen. Code, § 1525, provides: "A search-warrant cannot be issued but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property and the place to be searched."

single living unit. Indeed it is consistent with its being such in view of the family relationship. On this record the entire dwelling house, including the bedroom in which Govea was found, were "premises . . . occupied by WILLIE MENDOZA." At most, there may be some uncertainty in the record. Although Agent Armenta replied affirmatively to the inquiry whether he went to the "home" of defendant Govea, nevertheless, as we have pointed out (see fn. 6, *ante*), defendant's counsel did not contradict statements made at the hearing of the motion under section 995 that Govea was "in Willie Mendoza's house." On the record before us, the warrant was properly issued and legal on its face and we cannot say that the officers acted illegally in executing it. If, as defendant claims, essential evidence to support the indictment was illegally obtained, defendant can raise the objection at the trial (*People v. Prewitt* (1959) 52 Cal.2d 330, 335-336 [341 P.2d 1]) and "the ultimate decision on admissibility can be made at the trial on the basis of all the evidence bearing on the issue." (*Badillo v. Superior Court* (1956) 46 Cal.2d 269, 271-272 [294 P.2d 23] ; *People v. Prewitt, supra.*)

We therefore conclude that the evidence against defendant Govea (in 1/Crim. 4617) and against defendants Cota (in 1/Crim. 4618) was secured by lawful searches pursuant to valid search warrants and that said defendants were not indicted "without reasonable or probable cause." (Pen. Code, § 995.)

In *Bompensiero v. Superior Court, supra,* 44 Cal.2d 178, 183-184 it was said: "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People v. Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344].) An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. (*Lorenson v. Superior Court,* 35 Cal.2d 49, 56, 59 [216 P.2d 859] ; cf. *Greenberg v. Superior Court,* 19 Cal.2d 319, 322 [121 P.2d 713].)"

In respect to defendant Govea, a coffee can of marijuana was found which Govea acknowledged was his.

In respect to defendants Joe and Sylvester Cota, heroin was found in a coat which could have belonged to either of them and marijuana was found on the couch nearby. Sylvester claimed to be the owner of the coat and of any narcotics on the premises. However, the father said that the

coat belonged to Joe and Agent Armenta overheard Joe tell Sylvester in Spanish to take the blame and warn Corona and Macias to keep quiet about the narcotics. All of the above facts and circumstances are supportive of a strong suspicion that both Cota brothers were guilty of possessing heroin.

■■■ Finally we turn to inquire whether the arrest and search of defendants Corona and Macias in (1/Crim. 4619) and the search of their automobile were lawful and whether the trial court properly concluded that these two defendants were indicted without reasonable or probable cause.

At oral argument the Attorney General conceded that the arrests and searches were not pursuant to a warrant and that they were not made after a permissible temporary detention for questioning under the rule declared in *People* v. *Mickelson* (1963) 59 Cal.2d 448, 450, 451 [30 Cal.Rptr. 18, 380 P.2d 658] and similar cases. Indeed, no other position would be tenable since the record shows that Agent Ojeda and Sergeant Rodman stopped the automobile and searched both occupants and car forthwith.

The gist of the Attorney General's argument in support of a somewhat negative thesis that the search ''was not unreasonable'' seems to be this: (1) The search of the automobile on the spot was lawful since the officers had probable cause to believe that defendants had committed a felony and also probable cause to believe that the car was carrying contraband. As a result, the heroin produced by the search was competent evidence in support of count two. (2) The subsequent search of the car six hours later was lawful since at that time the car had been lawfully seized by the officers pursuant to Health and Safety Code sections 11610 and 11611.[20] As a result, the

[20]Section 11610 provides: ''The interest of any registered owner of a vehicle used to unlawfully transport or facilitate the unlawful transportation of any narcotic, or in which any narcotic is unlawfully kept, deposited, or concealed or which is used to facilitate the unlawful keeping, depositing or concealment of any narcotic, or in which any narcotic is unlawfully possessed by an occupant thereof or which is used to facilitate the unlawful possession of any narcotic by an occupant thereof, shall be forfeited to the State.''

Section 11611 provides: ''Any peace officer of this State, upon making or attempting to make an arrest for a violation of this division, shall seize any vehicle used to unlawfully transport any narcotic or to facilitate the unlawful transportation of any narcotic, or in which any narcotic is unlawfully kept, deposited or concealed or which is used to facilitate the unlawful keeping, depositing or concealment of any narcotic, or in which any narcotic is unlawfully possessed by an occupant thereof, or which is used to facilitate the unlawful possession of a narcotic by an occupant thereof, and shall immediately deliver such vehicle to the Division of Narcotic Enforcement of the Department of Justice to be held as evidence until a forfeiture has been declared or a release ordered.''

marijuana produced by the second search was competent evidence in support of count one. Essentially, the question which we face is this: Were Ojeda and Rodman warranted in entertaining an honest and strong suspicion that the occupants of the car which had driven up to the Cota residence, had just obtained narcotics there?

 "Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.]" (*People* v. *Ingle, supra,* 53 Cal.2d 407, 412-413; *People* v. *Torres* (1961) 56 Cal.2d 864, 866 [17 Cal. Rptr. 495, 366 P.2d 823], cert. denied 369 U.S. 838 [82 S.Ct. 866, 7 L.Ed.2d 842]; *People* v. *Fischer* (1957) 49 Cal.2d 442, 446 [317 P.2d 967].) The question of reasonable or probable cause to justify the arrest and search must be tested upon the facts which the record shows were known to the officers at the time the car was stopped. (*People* v. *Privett* (1961) 55 Cal.2d 698, 701 [12 Cal.Rptr. 874, 361 P.2d 602]; *People* v. *Jackson* (1958) 164 Cal.App.2d 759, 761-762 [331 P.2d 63].)

 Whatever reasonable grounds Agent Ojeda may have had to believe that narcotics traffic was being conducted on the Cota premises,[21] he had no previous knowledge of the Corona automobile or its occupants before it pulled into the Cota driveway at 7:15 p.m. on January 30. Nor did the agent then learn whose car it was or who were the occupants. Ojeda's observation of the crucial incident was made from a point 150 yards away. It took place at night, although there was testimony, not too precise, of street lights in the area and an intermittent light on Cota's rear porch. The incident on which the People rely, already summarized by us, culminated in a person not identified emerging from the house and "it *appeared* that . . . *something* was handed" (italics added) by such person to the driver of the car. There is nothing in the testimony to indicate that the actions of the persons observed were furtive or unusual in any respect.

Ojeda's testimony that he believed the incident to be a "pass" of narcotics is purely a speculation. He actually saw no such delivery and what he did observe could just as well have been a delivery of any innocent object or article, if

---

[21]See our summary, *supra,* of Ojeda's testimony as to his previous experiences with the Cota brothers and their residence.

indeed any delivery there was. Taking his testimony in context (it *appeared* that *something* was handed) and having in mind the physical circumstances, there may have been no delivery of anything, much less heroin. We do not believe that a reasonable man could entertain an honest and strong suspicion that anyone who drove up to the Cota house and *appeared* to be handed something was in fact receiving heroin.

No basis of reasonable or probable cause can be derived from the mere facts that defendants Corona and Macias were on premises known by the agents to be the scene of narcotics violations or that said defendants were in the presence of known narcotic violators.[22] (*People* v. *Privett, supra,* 55 Cal.2d 698, 702; *People* v. *Simon* (1955) 45 Cal.2d 645, 649 [290 P.2d 531]; *Lewis* v. *Superior Court* (1964) 226 Cal.App.2d 102, 104 [37 Cal.Rptr. 773]; *People* v. *Ross* (1963) 223 Cal.App.2d 196, 198 [35 Cal.Rptr. 754]; *People* v. *Green* (1957) 152 Cal. App.2d 886, 889 [313 P.2d 955]; *Montgomery* v. *Superior Court* (1956) 146 Cal.App.2d 622, 623 [304 P.2d 206].)

The arrest and the search of defendants and their automobile not having been made on probable cause, the heroin produced by the search was illegally secured. The subsequent search of the car, made six hours later, was likewise illegal since it depended upon, and must therefore fall with, the initial arrest and search which were illegal. The marijuana which it uncovered was also illegally obtained. ██ Neither search could be justified by what the searches turned up. (*People* v. *Brown* (1955) 45 Cal.2d 640, 643 [290 P.2d 528] and cases there collected; *People* v. *Gale* (1956) 46 Cal.2d 253, 257-258 [294 P.2d 13]; *People* v. *Haven* (1963) 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Mickelson, supra,* 59 Cal.2d 448, 454; *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].)

██ All of the evidence introduced against defendants Corona and Macias was the product of the initial illegal arrest and search. The narcotics uncovered by the searches were incompetent evidence. Corona's admissions that the bindle contained heroin, that it belonged to him and that he brought it from Mexicali were also incompetent as the " 'fruits' of the agents' unlawful action." (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 484-487 [83 S.Ct. 407, 9 L.Ed.2d 441]; *Walder* v. *United States* (1954) 347 U.S. 62, 64-65 [74 S.Ct. 354, 98 L.Ed. 503]; *Silverthorne Lumber Co.* v. *United States* (1920)

---

[22]Assuming that the person emerging from the house was one of the Cota brothers, a fact not established in the record.

251 U.S. 385, 392 [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426] ; *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763-768 [44 Cal.Rptr. 313, 401 P.2d 921] ; *Badillo* v. *Superior Court, supra,* 46 Cal.2d 269, 273; *People* v. *Dixon* (1956) 46 Cal.2d 456, 458 [296 P.2d 557] ; *People* v. *Macias* (1960) 180 Cal. App.2d 193, 197-199 [4 Cal.Rptr. 256].) Where *no competent* evidence has been presented to the grand jury to support a reasonable belief that the defendant is guilty of the offense charged, the indictment must be set aside on appropriate motion made under Penal Code section 995. (*Greenberg* v. *Superior Court, supra,* 19 Cal.2d 319, 322; *Bompensiero* v. *Superior Court, supra,* 44 Cal.2d 178, 183-184; *Rogers* v. *Superior Court, supra,* 46 Cal.2d 3, 8; *McFarland* v. *Superior Court* (1948) 88 Cal.App.2d 153, 158 [198 P.2d 318] ; *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 23 [345 P.2d 513] ; *Callan* v. *Superior Court, supra,* 204 Cal.App.2d 652, 661-662.) The order to that effect in 1/Crim. 4619 was proper.

In 1/Crim. 4617 the order setting aside the indictment against defendant Govea is reversed. In 1/Crim. 4618, the order setting aside the indictment against defendants Joe Villegas Cota and Sylvester Villegas Cota is reversed. In 1/Crim. 4619, the order setting aside the indictment against defendants Corona and Macias is affirmed.

Molinari, J., and Sims, J., concurred.

A petition for a rehearing in Crim. No. 4619 was denied July 13, 1965, and the petitions of the respondents in Crim. Nos. 4617 and 4618 and of the appellant in Crim. No. 4619 for a hearing by the Supreme Court were denied August 18, 1965. Peters, J., was of the opinion that the petitions should be granted.